FRANK S. MOORE, SBN 158029
Law Offices of Frank S. Moore, APC
235 Montgomery Street, Suite 440
San Francisco, California 94104
Telephone:    (415) 292-6091
Facsimile:    (415) 292-6694
fsmoore@pacbell.net

Attorney for Pre-Judgment Creditors WEN FANG WANG,
FRANK MOORE, MICHELLE MELEN

# UNITED STATES BANKRUPTCY COURT

## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

XIAOYONG LAI,

    Debtor.

WEN FANG WANG, FRANK MOORE,
MICHELLE MELEN,

    Plaintiffs,

    vs.

XIAOYONG LAI,

    Defendant.

                          No. 23-51382

Judge Stephen L. Johnson

Chapter 11

Adv. Proceeding No. _____

**COMPLAINT TO DETERMINE
NON-DISCHARGEABILITY OF DEBT
PURSUANT TO 11 U.S.C. §§ 523(a)(6)**

Plaintiffs WEN FANG WANG ("WANG"), FRANK MOORE ("MOORE") and MICHELLE

MELEN ("MELEN", collectively "CREDITORS") are prevailing parties in the matter of *LAI v. WANG,*

*et al.,* Santa Clara County Superior Court Case No. 17CV308093 who were awarded attorneys' fees and

costs pursuant to Code of Civil Procedure section 425.16, subdivision (c), California's anti-SLAPP

statute.  Debtor XIAOYONG LAI ("LA") filed this Chapter 11 petition on November 29, 2023, the

week after the Honorable Socrates P. Manoukian adopted his tentative ruling ordering LAI to pay

WANG, MOORE and MELEN attorneys' fees in the amount of $169,200.00 and $4,703.12 in costs.

Case: 23-51382   Doc# 18   Filed: 12/06/23   Entered: 12/06/23 10:39:37   Page 1 of 44

A true and correct copy of the tentative ruling is attached hereto as Exhibit K.

CREDITORS prepared a proposed Order which was pending Judge Manoukian's signature on November 27, 2023. A true and correct copy of the proposed order is attached hereto as Exhibit L. LAI's Chapter 11 petition was filed before the Order was signed or before judgment thereon could be entered. WANG is the former client of attorney and debtor defendant LAI; MOORE and MELEN are attorneys who represented WANG and who were sued by LAI. All three were determined to be prevailing parties under California's anti-SLAPP statute by the Superior Court of Santa Clara County and the Sixth District Court of Appeal in California, Case No. H047118. CREDITORS bring this action to determine the non-dischargeability of debt pursuant to 11 U.S.C. §523(a)(6), (b)(4) and (b) (11) and in support thereof alleges as follows:

## I.   INTRODUCTION AND IDENTIFICATION OF PARTIES

1.      Plaintiff WANG is an immigrant to the United States from Taiwan and came to the United States through her husband-sponsor, a U.S. Citizen. English is WANG's second language. WANG's family continues to reside in Taiwan. WANG resides in this district.

2.      Defendant LAI is a member of the California bar who represented WANG as her family law attorney in a dissolution action in the San Mateo Superior Court, *Wen Fang Wang v. Danny Shin Kim,* Case No. 16-FAM-01113 ("the family law case"). LAI sued WANG in the matter *LAI v. WANG, et al.,* Santa Clara County Superior Court Case No. 17CV308093 over a fee dispute as more fully alleged below. LAI resides in this district.

3.      Plaintiff MELEN is a member of the California bar who represented WANG after LAI abandoned WANG as her attorney as more fully alleged below. Defendant LAI sued MELEN over his fee dispute with WANG in Case No. 17CV308093 as more fully alleged below. MELEN resides in this district.

4.      Plaintiff MOORE is a member of the California bar who represented WANG in a Mandatory Fee Arbitration proceeding which never took place. Defendant LAI sued MOORE over his fee dispute with WANG in Case No. 17CV308093 as more fully alleged below. MOORE resides in this district.

///

Case: 23-51382   Doc# 18   Filed: 12/06/23   Entered: 12/06/23 10:39:37   Page 2 of 44

## II.  STATEMENT OF RELEVANT FACTS

**A.  WANG's Financial Status During LAI's Representation of Her**

5.      WANG was in the marriage for 13 years and her husband, a U.S. Citizen, controlled all the finances for the family.  Her husband's occupation was in financial matters.  He never shared any financial information with her and she put her trust and faith in him to manage those affairs. A true and correct copy of WANG's Declaration in Support of Special Motion to Strike (WANG Decl.) is attached hereto as Exhibit A, p. 2, ¶3.)

6.      During the marriage and while WANG was residing with her husband in the U.S., WANG's mother loaned her and her husband money to buy their house, which was foreclosed upon after WANG's husband ran into financial difficulties.  WANG's mother provided the couple $89,000 for the down payment in 2005.  WANG's brother gave thousands of dollars per year to her husband to invest for his children's college fund which continued on a yearly basis until 2015.  The amount WANG's brother had invested with her husband was more than $120,000. (WANG Decl. [Exhibit A hereto], p. 2, ¶4.)

7.      WANG and her husband began having difficulties in their marriage during a time of acute financial distress her husband was experiencing with his business. On July 13, 2015, WANG's husband wired $89,290 to their Discover Account which was the money for her mother to be paid back. After pleading with her husband to also pay back her brother, WANG's husband provided $120,000, $45,000 in cash and $75,000 by wire.  On September 9, 2016, WANG sent $89,085.00 to her mother to pay her back for the money she lent the couple for the house.  WANG continued to try to persuade her husband to provide more money to pay back her brother for the amounts over the $120,000.  WANG held onto her brother's *Marvin*[1] distribution while she continued to press her husband for the additional funds her brother had invested with him. (WANG Decl. [Exhibit A hereto], p. 2, ¶4.)

**B.  LAI's Retention and Retainer Agreement With WANG**

8.      On October 7, 2016, WANG's husband filed a Petition for Dissolution of Marriage proceeding in San Mateo Superior Court. When she faced divorce by her husband, WANG found LAI

---

[1]      Under *Marvin v. Marvin*, 18 Cal.3d 660 (1976), WANG had the right, even as a nonmarital partner, to enforce express or implied agreements for property sharing,

in a listing in a Chinese-language yellow pages in a Chinese super market on June 2016. (WANG Decl. [Exhibit A hereto], p. 2, ¶5.)

9. LAI proposed that WANG enter into a written retainer agreement. LAI originally proposed language in his retainer agreement that he would not ask WANG to pay him any fees and that he would collect fees from her husband by asking the court to order her husband to pay his fees. LAI proposed revisions to the retainer agreement and when they discussed what he was going to revise, LAI repeatedly used the term "contingent" in Mandarin which WANG understood to mean she would not need have to pay him unless he prevailed for her in the case and he collected court-awarded fees from her husband. LAI's handwriting on the initial retainer agreement has the repeated terms "contingent upon" which he wrote when they were discussing his revisions. LAI prepared another agreement. While WANG could not fully understand the terms set forth in the written retainer agreement due to her limited English skills, LAI explained to her in Mandarin that she would not have to pay him unless he was awarded fees from the judge in the family law matter that would be paid by her husband. (WANG Decl. [Exhibit A hereto], p. 3, ¶6.)

10. The operative language is: "The fee arrangement, as agreed upon, will be based on an hourly fee in the amount of $300, contingent upon the court's order for attorney's fee and costs to be paid by the other party. (The Attorney will ask the court to order the opposing party to pay for the attorney's fees; the Attorney will not ask the Client to pay for the attorney's fees.)" A true and correct copy of LAI's retainer agreement is attached as Exhibit B to WANG's Decl. (Exhibit A hereto.)

11. Another provision of the retainer agreement states in relevant part: "We may terminate our representation (to the extent permitted by the ethical and court rules) at any time if you breach any material term of this agreement or fail to cooperate or follow our advice on a material matter, if conflict of interest develops or is discovered, or if there exists at any time any fact or circumstance that would, in our opinion, render our continuing representation unlawful, unethical, or otherwise inappropriate." (Hereinafter referred to as "termination clause" – Exhibit B to WANG's Decl. [Exhibit A hereto].)

## C. LAI's Representation of WANG in the Family Law Case

12. During his representation of WANG, LAI did not keep her informed about a plan for representing her. WANG called LAI regularly and repeatedly and yet she could not reach him except

1   for the day before the first court date. LAI did not prepare WANG for either the November 18, 2017 or

2   the January 25, 2017 hearings held in the family law case. (WANG Decl. [Exhibit A hereto], p. 3, ¶7.)

3          13.     When WANG was able to reach LAI, he was dismissive of her and answered her

4   inquiries with no sense of urgency.  LAI exhibited a cavalier attitude toward WANG.  WANG had

5   explained to LAI how money her husband had paid over to her to pay back her brother and mother in

6   Taiwan was money that had been provided for the down payment for the house and the investment for

7   her brother's children well before any hearing had taken place in the family law case. WANG gave LAI

8   the documentation of some of these transactions.  This documentation (bank statements) showed

9   WANG's receipt of the money from her husband and the wire transfers ($75,000 on July 13, 2015 and

10  $89,290 on August 13, 2015). (WANG Decl. [Exhibit A hereto], p. 3, ¶8.)

11         14.     When WANG spoke with LAI, he appeared not fully focused on her words when she was

12  explaining the financial arrangements between her and her husband and her two family members,

13  brother and mother.  LAI replied to WANG by saying he did not need to know of her family assets at

14  that point and if needed, he would ask her about it later. (WANG Decl. [Exhibit A hereto], p. 3, ¶8.)

15         15.     For the first court appearance in the family law case on November 18, 2016, LAI

16  informed WANG that the first court appearance was not important, would only take 15 minutes and no

17  preparation was necessary.  On December 27, 2016, LAI submitted a declaration in support of an award

18  of attorneys' fees in the family law case claiming, as of that date, that he had expended 49.2 hours for

19  legal work for an award of $14,760. (WANG Decl. [Exhibit A hereto], p. 4, ¶9.)

20         16.     In the family law case, WANG's husband attempted to challenge the legal validity of the

21  marriage performed in Taiwan.  For the second court appearance on January 25, 2017, LAI told WANG

22  that she would win easily and that the court was only looking into the validity of the marriage and

23  nothing else. No legal guidance or preparation was provided to WANG by LAI. (WANG Decl. [Exhibit

24  A hereto], p. 4, ¶10.)

25  **D.**     **Informal _Marvin_ Distributions Acknowledged in WANG's Dissolution of Marriage**
             **Proceeding**

26

27         17.     For the second court appearance on January 25, 2017, LAI did not prepare WANG for

28  questioning before the hearing.  WANG had provided LAI color photos of the wedding ceremony

between her and her husband performed in Taiwan and WANG had anticipated LAI would bring them to the hearing to show to the judge because she understood that her husband was challenging the validity of the marriage. LAI did not have those photos to show at the hearing on January 25, 2017. LAI also failed to arrange for an interpreter for WANG which was a problem because she has limited English skills. (WANG Decl. [Exhibit A hereto], p. 4, ¶11.)

18. WANG went into the hearing on January 25, 2017 blindly unprepared for any of the questions regarding the financial situation in the proceedings. (WANG Decl. [Exhibit A hereto], p. 4, ¶12.) During the hearing, WANG's husband's attorney acknowledged:

> Under essentially an informal *Marvin* distribution, Petitioner had or Ms. Wang had asked Mr. Kim [husband] to hold approximately $80,000 of her money that was from a house that got foreclosed on. ¶ My client assumed the loss and also washed out a substantial amount of his 401K at the time approximately half.

(See Exhibit E to WANG Decl. [Exhibit A hereto], Transcript of January 25, 2017 Hearing, p. 7.)

19. This $80,000 was the down payment WANG's mother loaned the couple and which WANG paid back. LAI himself acknowledged this in open court: "Because when they purchase a house her mother loan, um, substantial money to Respondent. So that money was to pay back her mother's loan. And I have e-mail to substantiate that, Your Honor." The judge was satisfied by reviewing an email revealing that the $85,000 was to pay back WANG's mother by directing his question to WANG's husband's lawyer, to wit: "Did you read the e-mail? Your client [husband] said he owed 85,000 to the petitioner's mother." (See Exhibit E to WANG Decl. [Exhibit A hereto], Transcript of January 25, 2017 Hearing, p. 8.)

20. When WANG's husband's attorney questioned the rest of the money her client had provided WANG as part of the *Marvin* distribution, LAI was unprepared. The judge then asked if WANG had received a wire transfer from her husband for $75,000. The judge asked WANG if she had received "another 75,000 on top of the 85,000" and, instead of allowing WANG to respond verbally, LAI asserted "No, Your Honor." (See Exhibit E to WANG Decl. [Exhibit A hereto], Transcript of January 25, 2017 Hearing, pp. 12-13.)

21. WANG had not seen what the judge was referring to and she was not prepared for a response due to faulty memory and not being prepared by reviewing documents. WANG had no

knowledge regarding the number of bank accounts her husband had opened and had very limited knowledge about the financial information: bills, cash assets, credit cards, bank accounts, payments, etc. LAI had not prepared WANG for testimony on January 25, 2017. (WANG Decl. [Exhibit A hereto], p. 4, ¶13.)

22. During the hearing on January 25, 2017, WANG observed LAI appear to be very embarrassed by his lack of preparation and his unwillingness to listen to her when she had explained these financial transactions before in his office. The judge held a recess so that the parties could work it out. (WANG Decl. [Exhibit A hereto], p. 5, ¶14.)

23. During the recess, LAI began yelling at WANG outside the court room. He accused WANG of lying about $160,000 that was for her mother and brother. WANG explained to LAI that she did not know the specific information being asked during the hearing. (WANG Decl. [Exhibit A hereto], p. 5, ¶15.)

24. After the recess, WANG's husband's attorney represented to the judge: "It was verbally confirmed that there were two wire transfers. The first was July 13th, 2015 in the amount of $89,290. The second one was August 13th, 2015 in the amount of $75,000 to Ms. Wang." LAI did not dispute this representation to the San Mateo Superior Court. (See Exhibit E to WANG Decl. [Exhibit A hereto], Transcript of January 25, 2017 Hearing, pp. 13-14.)

25. Then, after a discussion about support, the judge said: "But I also have he gave her $75,000 in excess that they're telling me." LAI responded: "Honor, that's his brother's money. . . . His brother's money. He placed the money with Daniel for investment purposes. So that's not her money. . . . She placed the money with Daniel. So her brother gave her cash. And she place money with him." (Exhibit E to WANG Decl. [Exhibit A hereto], p. 17:16-25.)

**E.    LAI's Termination of WANG as His Client and Abandonment of Her as Her Attorney in the Family Law Case**

26. On January 25, 2017, after that particularly poor performance in court, LAI terminated his services to WANG by way of email, to wit:

> Because I have been repeatedly lied to and constantly misinformed, I am not able to continue representing you. Therefore, I am terminating my representation now, and you will have 30 days from today's date to find a new attorney. Since next status hearing is on March 10, 2017, at 2:00 p.m., the change of attorneys won't affect your case.

The costs incurred so far are $1,876, including expert witness fees of $1750 (invoice of which is attached), fax filing of $50, process service of $68, and overnight mail of $8.

(WANG Decl., p. 5, ¶16 [Exhibit A hereto], and Exhibit F thereto.)

27.     LAI never withdrew from representation but he told WANG he would not represent her anymore. After he terminated her as his client, WANG went looking for new representation and legal advice, though LAI remained her attorney of record in the family law case.  WANG had another legal matter she needed help with in obtaining a restraining order and she was fortunate enough to obtain pro bono legal help from Elizabeth C. Peterson, Esq., of Wilson, Sonsini, Goodrich and Rosati PC. (WANG Decl., p. 5-6, ¶17 [Exhibit D hereto].)  LAI became aware of WANG's relationship with Ms Peterson and on January 27, 2017, he wrote an email to WANG which stated: "You apparently have no intention to pay the costs and attorney's fees, and we will have to deal with it at court later, based on your intentional misrepresentations on your financial situation, and I will call your other attorneys, including Ms. Peterson, as witnesses."  (WANG Decl., pp. 5-6, ¶17 [Exhibit A hereto], and Exhibit G thereto.)

28.     On January 29, 2017, LAI sent WANG another email in which he wrote:

Unfortunately you still are not truthful as of now. When you came to me, you never told me that Danny [husband] made the two wire transfers of $89,290 and $75,000 to you. Instead, you misrepresented to me that you had no funds in bank, and you even so stated under penalty of perjury in your declarations.

. . .

Those misrepresentations will be exposed easily. As such, on a friendly note, I want to say that although you have a fair chance of winning this case, your lack of credibility is going to destroy that very chance. [Chinese Characters] God Is watching everything you do.

. . .

Your trip of free-ride on attorneys stops right here. You will not be allowed to defraud other attorneys, and I will assure no other good-hearted attorney will be taken advantage by you.

(WANG Decl., p. 6, ¶18 [Exhibit A hereto], and Exhibit H thereto.)

29.     LAI remained attorney of record in the family law case until he made WANG substitute in place as a pro se litigant on February 28, 2017.  WANG continued looking for an attorney. (WANG Decl., p. 6, ¶19 [Exhibit A hereto].)

///

///

**F.  WANG's State Bar Complaint Against LAI at the Recommendation of Her Pro Bono Counsel, Elizabeth C. Peterson, Esq.**

30.  WANG initiated a State Bar Complaint in March 2017.  A true and correct copy of the State Bar Complaint (without exhibits) is attached hereto as Exhibit F to WANG's Declaration in Support of Opposition to Plaintiff X. Young Lai's Renewed Motion to Lift Stay And to Appoint a Forensic Expert ["WANG's Opp. Decl."] – Exhibit B hereto. WANG informed Elizabeth C. Peterson, Esq., how LAI was treating her and she recommended that WANG make a complaint with the State Bar of California about his conduct. WANG followed Ms. Peterson's recommendation and sent the complaint to the State Bar on or around March 2017. WANG listed Elizabeth C. Peterson, Esq., as her witness in the State Bar complaint. (WANG Decl., p. 6, ¶19 [Exhibit A hereto].)

31.  Among the allegations WANG made about LAI's unethical and negligent conduct as her attorney in the family law case, WANG asserted that  LAI "stared at [her] private areas each time, it made [her] very uncomfortable scared and upset."  (WANG's Opp. Decl., p. 5, ¶18 and Ex. F thereto – Exhibit B hereto.)

32.  While LAI would falsely accuse MELEN of instigating the State Bar Complaint in his First Amended Complaint ("FAC" – Exhibit C hereto, pp. 4, 5, ¶¶26, 30), MELEN was not WANG's lawyer at the time she made the State Bar complaint on or around March 2017 and had no involvement in WANG's decision to make the complaint. (WANG Decl., p. 7, ¶21 [Exhibit A hereto]; Exhibit D hereto – Declaration of MELEN in Support of Special Motion to Strike, p. 5, ¶13.)  Neither did MOORE who WANG retained much later to represent her in Mandatory Fee Arbitration. (Exhibit E hereto – Declaration of MOORE [MOORE Decl.] in Support of Special Motion to Strike, p. 2, ¶3.)

**G.  LAI's Lawsuit and WANG's Retention of MELEN in the Family Law Case**

33.  LAI sued WANG on April 3, 2017, with a form complaint containing two causes of action, fraud and breach of contract, bereft of any factual allegations except the bare allegation that WANG had misrepresented "her financial condition and her marital status." (Complaint, pp. 1-6 – Exhibit F hereto.) WANG retained a family law specialist, MELEN, who substituted in as her counsel in the family law matter on or about April 14, 2017. (MELEN Decl., pp. 1-2, ¶1-2 – Exhibit D hereto.) LAI's original complaint averred that, in addition to lying about the *Marvin* distribution, WANG had

1  lied about her marital status to her husband, the very core legal issue involved in the dissolution action

2  in the family law case. (Complaint, pp. 1-6 – Exhibit F.)

3       34.     WANG had never received any notice from LAI about her right to MFA before he filed

4  suit against her. WANG requested MFA after she was informed she had a right to do so and that the

5  dispute might get resolved in that proceeding. (WANG Decl., p. 7, ¶22 [Exhibit A hereto].)  Thereafter,

6  WANG hired MOORE on or about February 27, 2018, on a limited scope basis to represent her in

7  that MFA. (*Ibid.*) MELEN agreed to act as WANG's expert for the MFA. (WANG Decl., p. 7, ¶23

8  [Exhibit A hereto]; MELEN Decl., pp. 1, 4, ¶¶1, 10 – Exhibit D hereto.)  Before WANG hired MOORE

9  to represent her in the MFA, MOORE had no prior knowledge of or dealings with either WANG or

10  MELEN. (MOORE Decl., p. 2, ¶3 – Exhibit E hereto.)

11       35.     MOORE prepared two briefs for the MFA which are not required under Santa Clara

12  County Bar Association Rules of Procedure for Attorney-Client Fee Arbitrations, were served on LAI

13  and sent to the Santa Clara County Bar Association, but were never considered by the arbitration panel

14  since the MFA never commenced.  These briefs did not constitute evidence and merely summarized

15  what WANG expected the evidence to show, the universally accepted view of what briefs are and their

16  function.  In one of the briefs, there was a spreadsheet that WANG provided to MOORE which listed

17  bank transactions from one of WANG's bank accounts (Discover).  The bank records were inadvertently

18  omitted from the Exhibit, but nothing on the spreadsheet was redacted. The only documents redacted

19  were emails LAI had sent to WANG and the only portion redacted was the handwritten "Exhibit" letters

20  that WANG had affixed when she used the document as Exhibits to her State Bar complaint.  The

21  redaction of the "Exhibit" letters was so as to avoid confusion in the MFA had a hearing taken place.

22  (MOORE Decl., p. 3, ¶5 – Exhibit E hereto.)

23  **H.     WANG's Aborted Mandatory Fee Arbitration**

24       36.     MELEN, WANG, MOORE and an interpreter appeared for the MFA hearing that was

25  to commence on July 19, 2018, at the Santa Clara County Bar Association Office in San Jose.

26  Unfortunately, one of the Arbitration members of the panel of arbitrators could not participate due to

27  being called back to court as a witness to a crime. LAI, who was also present, would not consent to less

28  than a 3 member panel.  So, the MFA hearing had to be continued.  No proceeding took place. (MELEN

Decl., p. 5, ¶11 – Exhibit D hereto.)

37.     While waiting for the MFA hearing to take place, MOORE asked LAI why he would not simply enforce his fees in the fee petition he had pending before the San Mateo Superior Court in the family law case. LAI replied: "because I want a punitive damages award against her [WANG]."

38.     Once a date had been announced for the continued MFA, for a date in October 2018, given the limited resources WANG had, it was decided that the decision to proceed depended upon whether LAI would consent to binding arbitration rather than what he had elected, non-binding arbitration. LAI refused. The MFA was withdrawn after LAI refused to make it binding rather than non-binding. (WANG Decl., p. 7, ¶23 [Exhibit A hereto]; MELEN Decl., p. 5, ¶12 – Exhibit D hereto; (MOORE Decl., p. 4, ¶¶7-8 – Exhibit E hereto and Exhibit A thereto.)

I.      **The Family Law Proceedings Without LAI**

39.     LAI never informed the San Mateo Superior Court that he had withdrawn his claim for fees in the petition he had filed or that he had filed a separate suit for fees as expected of him under the authorities *In re Marriage of Borson*, 37 Cal.App.3d 632 (1974), *In re Marriage of Read*, 97 Cal.App.4th 476 (2002) and *Meadow v. Superior Court*, 59 Cal.2d 610 (1963) (see discussion of these case in *In re Marriage of Erickson & Simpson*, 141 Cal.App.4th 707 (2006). He had not taken any action in the family law case about those fees before he required WANG to substitute herself in as a pro se litigant. Under *In re Marriage of Borson, supra,* 37 Cal.App.3d 632, 637, the law allows a former attorney to request relief on behalf of his former client. (MELEN Decl., p. 4, ¶9 – Exhibit D hereto.)

40.     In the family law case, MELEN updated the application for fees to include her own time which was in addition to LAI's claim for an award of fees notwithstanding his failure to comply with *In re Marriage of Borson, supra,* 37 Cal.App.3d 632. However, MELEN informed the San Mateo Superior Court that WANG had disputed LAI's contractual claim for fees in the Mandatory Settlement Conference Statement MELEN filed on WANG's behalf on October 1, 2018. (MELEN Decl., p. 4, ¶9 – Exhibit D hereto and Exhibit C thereto.)

41.     When MELEN took over the family law case from LAI, WANG's husband was contesting the validity of the marriage ceremony performed in Taiwan. That contention was put to rest on March 27, 2018, when the Honorable Don Franchi of the San Mateo Superior Court issued his

1  Findings and Order after Hearing that "there was no evidence of an agreement between the parties that

2  the vows/ceremony would not constitute a wedding," that WANG's husband "went along with

3  everything" and "[i]n doing so, he satisfied all of the requirements of a valid marriage under Taiwanese

4  law" and "[t]herefore, the Court finds that there is a valid marriage." (Exhibit D to MELEN Decl. –

5  Exhibit D hereto .)

6         42.    Thereafter, WANG's husband sought to nullify the marriage. During the trial on this part

7  of the family law proceeding on October 29, 2018, WANG and her husband entered into a Stipulation

8  and Order that, in addition to setting aside the March 27, 2018 Findings and Order after Hearing,

9  stipulated that both of them "shall be treated as putative spouses under California law, including spousal

10 support and property rights." (MELEN Decl., p. 5, ¶11 – Exhibit D hereto and Exhibit E thereto.)

11        43.    Consistent with California law on putative spouses, WANG and her husband  agreed in

12 the October 29, 2018 Stipulation and Order that all other issues not resolved thereby, including property

13 division, was reserved for further proceedings in the family law case consistent with Family Code

14 section 2251, subdivision (b). (MELEN Decl., p. 3, ¶¶6-7 – Exhibit D hereto.)

15 **J.    LAI's First Amended Complaint Claims Against MELEN, MOORE and WANG Arising**
16 **Out of a State Bar Complaint and Submissions Made to a Mandatory Fee Arbitration**
   **Proceeding**

17        44.    LAI's initial complaint was a form complaint (hereinafter, "LAI's Lawsuit") filed solely

18 against WANG and was bereft of factual allegations supporting his fraud and breach of contract claims

19 other than misrepresentations that WANG had purportedly made about her "financial condition" and

20 "marital status." (Complaint, p. 5 – Exhibit F hereto.)  MELEN, WANG's family law attorney, did not

21 typically practice civil litigation but, having advised WANG of her right to Mandatory Fee Arbitration

22 and obtaining a stay of LAI's civil action, remained her attorney of record in the matter. (MELEN Decl.,

23 p. 1, ¶1 – Exhibit D hereto.)

24        45.    MOORE substituted in as counsel for MELEN and filed a demurrer and motion to strike

25 this original complaint as well as a Notice of Related Case identifying the family law case as a related

26 case on December 3, 2018.  In response to a demurrer and motion to strike, LAI filed his FAC on

27 January 14, 2019, making the demurrer and motion to strike moot.  Simultaneously with filing the FAC,

28 LAI added two defendants, MOORE and MELEN by substituting them in as DOE Defendant 1 and

Case: 23-51382   Doc# 18   Filed: 12/06/23   Entered: 12/06/23 10:39:37   Page 12 of
44

1   DOE Defendant 2 to LAI's Lawsuit (Exhibit C hereto) when both MOORE and MELEN were actively

2   representing WANG at the time.  LAI added three additional causes for malicious prosecution, abuse

3   of process and "conspiracy." The three additional causes of action were alleged against WANG and her

4   attorneys. (Exhibit C hereto.)  LAI dropped any claim about WANG misrepresenting her "marital

5   status." (*Id*.)

6          46.     Defendants WANG, MOORE and MELEN filed a special motion to strike Plaintiff LAI's

7   FAC as to all causes of action (fraud, contract, common counts, malicious prosecution, abuse of process

8   and "conspiracy" to commit same) under California's anti-SLAPP statute (Code of Civil Procedure, §

9   425.16) on January 25, 2019.

10          47.     On May 9, 2019, Judge Peter H. Kirwin of the Santa Clara County Superior Court

11  granted the special motion to strike the complaint pursuant to Code of Civil Procedure section 425.16

12  motion of defendants MOORE and MELEN in its entirety and of defendant WANG on the cause of

13  action for malicious prosecution, abuse of process and conspiracy but not on the contract and fraud

14  causes of action.

15          48.     On May 28, 2019, LAI filed his Notice of Appeal. On June 26, 2019, WANG filed a

16  Notice of Cross-appeal of Judge Kirwin's May 16, 2019 Order denying her motion to strike LAI's

17  breach of contract and fraud causes of action.

18          49.     On May 10, 2023, the Sixth District Court of Appeal reversed Judge Kirwin's May 9,

19  2019 Order denying her special motion to strike as to the fraud, breach of contract, and common

20  counts causes of action and directing a new order granting WANG's anti-SLAPP motion.

21  (May 10, 2023-Opinion, *X. YOUNG LAI v. WEN FANG WANG et al.*, Sixth District Court of Appeal

22  Case No. H047118, p. 35 ["Sixth Appellate Opinion"] – Exhibit J hereto.)

23          50.     On November 20, 2023, the Santa Clara County Superior Court issued a tentative

24  ruling on WANG, MOORE and MELEN's motion for an award of attorneys' fees and costs as

25  prevailing parties under Code of Civil Procedure section 425.16, subdivision (c) in the amount of

26  $169,200.00 and $4,703.12, respectively, the Honorable Socrates Manoukian presiding. (Exhibit K

27  hereto.)  LAI contested the tentative ruling and appeared for oral argument on November 21, 2023.

28  Judge Manoukian pointed out that LAI did not oppose the motion for fees and costs with any

evidence and adopted the tentative ruling.

51.    MOORE prepared a proposed form of order, sent it to LAI on November 21, 2023, for review and approval then sent it to the Santa Clara County Court for Judge Manoukian's signature which was received by the Court on November 27, 2023. (Exhibit L hereto.)   On November 28, 2023, LAI filed this Chapter 11 petition and served and filed a notice of automatic stay on WANG, MOORE and MELEN before Judge Manoukian signed the proposed order and before judgment could be entered on LAI's Lawsuit.

### III.    JURISDICTION AND VENUE

52.    The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 157 and 1334 and 11 U.S.C. § 523. This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(6) and 7001(9) and a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)(I) and (O).

53.    Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

### IV.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### [WILLFUL AND MALICIOUS INJURY TO LEGAL RIGHTS OF CREDITOR] 11 U.S.C. § 523(a)(6)

54.    Plaintiffs re-allege and fully incorporate the allegations pleaded above.

55.    Debts "for willful and malicious injury by the debtor to another entity or to the property of another entity" are non-dischargeable. 11 U.S.C. § 523(a)(6). Non-dischargeability under § 523(a)(6) requires proof of both the "willful" and "malicious" elements of the statute. See *Barboza v. New Form, Inc. (In re Barboza),* 545 F.3d 702, 706 (9th Cir.2008).  The "willful" and "malicious" requirements are conjunctive and subject to separate analysis. *Id*.; *Carrillo v. Su (In re Su),* 290 F.3d 1140, 1146–47 (9th Cir.2002). A creditor must demonstrate nondischargeability by a preponderance of the evidence. *Jett v. Sicroff (In re Sicroff),* 401 F.3d 1101, 1106 (9th Cir.2005).

56.    The "willful" component of § 523(a)(6) requires intent to injure. *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (*Geiger*).  As the Supreme Court explained, "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act

that leads to injury." *Id.* A deliberate or intentional injury requires that the actor desired or intended that the resulting consequences of the act occur, not simply that the actor intentionally engaged in the act itself. 523 U.S. at 61-62, 118 S.Ct. 974. Typically, a non-dischargeable debt under § 523(a)(6) "triggers in the lawyer's mind the category of 'intentional torts,' as distinguished from negligent or reckless torts." *Id.* at 62, 118 S.Ct. 974.

57.     A "malicious" injury requires: "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202, 1209 (9th Cir.2001).  Only intentional malice or fraud will support a finding under § 523(a)(6). *Plyam v. Precision Dev. LLC (In re Plyam)*, 530 B.R. 456, 465 (9th Cir. BAP 2015).  The "malicious" component of § 523(a)(6) requires the Court to examine the debtor's motives and any claimed justification or excuse for taking the action while desiring, knowing or intending that the action will cause the resulting harm. See *Door, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek),* 983 F.2d 1524, 1527 (10th Cir. 1993) ("[T]he debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite 'malice' in addition to 'willfulness' is present.")

58.     While it is the case that a frivolous lawsuit by itself is not necessarily wrongful for purposes of 11 U.S.C. § 523(a)(6) (*In re Wrenn,* 791 F.2d 1542, 1543–44 (11th Cir.1986)), bankruptcy courts have found that meritless suits meet the requirement for willful and malicious under Section 523(a)(6). *Hughes v. Arnold*, 393 B.R. 712, 719 (E.D.Cal.2008), aff'd 347 Fed.Appx. 359, 2009 WL 3227147 (9th Cir.2009) (Where a debtor knowingly prosecuted a groundless action, the Court concluded that she intended to injure the opposing law firm and that her conduct was therefore willful within the meaning of § 523(a)(6)); *In re Mansel,* 2001 WL 832358, at *8 (Bankr.N.D.Ill.2001) ("Willfulness, under the *Geiger* standard, has been found where a Debtor filed a lawsuit without having a factual basis for the claim and thereby caused another to incur substantial attorney's fees in defending himself."); and *In re Chaires,* 249 B.R. 101, 106 (Bankr.D.Md.2000) (An attorney who pursued a lawsuit in bad faith and without justification caused a willful and intentional injury for purposes of § 523(a)(6)); *Ball v. A.O. Smith Corp.,* 451 F.3d 66 (2d Cir.2006) (debt arising out of sanction award against debtor-attorney in an underlying action was

Case: 23-51382   Doc# 18   Filed: 12/06/23   Entered: 12/06/23 10:39:37   Page 15 of
44

nondischargeable debt under § 523(a)(6) because the conduct giving rise to the sanction award was willful and malicious insofar as the debtor-attorney initiated that action unreasonably and for an improper purpose.)  Willfulness, under the *Geiger* standard, has been found where a Debtor filed a lawsuit without having a factual basis for the claim and thereby caused another to incur substantial attorney's fees in defending himself. *French, Kezelis & Kominiarek, P.C. v. Carlson (In re Carlson)*, 224 B.R. 659, 662 (Bankr.N.D.Ill.1998) (citing *In re Arlington,* 192 B.R. 494, 500 (Bankr.N.D.Ill.1996) [the debtor's acts were found to be willful because the Debtor necessarily knew and intended that the plaintiff's law firm would incur expenses in defending the lawsuit, particularly because the debtor filed the suit to get back at the plaintiff for defeating him in an earlier case].)

59.     Even absent direct evidence of a debtor's specific intent to injure, a creditor can satisfy the "willful" component by proving facts from which the Court may infer that the debtor undertook the act with the belief that the consequences of the act were substantially certain to occur. See *Bank of Commerce & Trust Co. v. Schupbach (In re Schupbach),* 500 B.R. 22, 35–36 (Bankr. D. Kan. 2013) (Willful injury under § 523(a)(6) may be established "indirectly by evidence of ... the debtor's knowledge that the conduct will cause particularized injury.") (quoting See *In re Longley,* 235 B.R. 651, 657 (10th Cir. BAP 1999)); *cf. Panalis v. Moore (In re Moore),* 357 F.3d 1125, 1129 (10th Cir. 2004) (citing cases that hold that the "willful" component is satisfied if the debtor believed that the consequences of the act are substantially certain to result from the action taken); *Shaw v. Osborne (In re Osborne),* 604 B.R. 582, 591 (Bankr. M.D. Ga. 2019) (willfulness is shown if the debtor acted with the desire to cause the resulting harm, with knowledge that the injury would occur, or in the belief that harm was substantially certain to result) (citations omitted); *Burris v. Burris (In re Burris),* 598 B.R. 315, 334 (Bankr. W.D. Okla. 2019) (The "willful" component requires that the debtor desired to cause injury or believed the injury was substantially certain to occur). The Court measures intent under the "willful" component using a subjective standard of the debtor's belief. *Burris v. Burris (In re Burris),* 598 B.R. 315, 334 (Bankr. W.D. Okla. 2019) (citations omitted); *Utah Behavior Servs., Inc. v. Bringhurst (In re Bringhurst),* 569 B.R. 814, 823 (Bankr. D. Utah 2017).

60. Plaintiffs recognize that an award of fees and costs under California's anti-SLAPP statute are not per se nondischargeable. See *In re Drake,* 583 B.R. 881 (Bankr. E.D. Vir. 2018); *In re Goland,* 2017 WL 874975 (Bankr. C.D. Cal. March 3, 2017). Rather, whether such fees and costs are nondischargeable depends whether the conduct leading to them was "willful and malicious." *Suarez v. Barrett (In re Suarez),* 400 B.R. 732, 737 (9th Cir. BAP 2009), aff'd, 529 F. App'x 832 (9th Cir. 2013). A court can hold that sanctions arising out of an anti-SLAPP motion are "willful and malicious" "only after analyzing the evidence to determine the plaintiff's intent." *Hamm v. Burcar (In re Hamm),* BAP No. CC-20-1049-LSF, 2020 WL 5814362, at *7 (9th Cir. BAP Sept. 29, 2020); see also *Healy v. Rose (In re Healy)*, BAP No. EC-13-1200-PaJuKu, 2015 WL 3407237, at *7 (9th Cir. BAP May 27, 2015) (affirming the bankruptcy court's decision that state court's ruling was entitled to issue preclusive effect and anti-SLAPP sanctions were nondischargeable as "willful and malicious" under § 523(a)(6)), aff'd, 689 F. App'x 516 (9th Cir. 2017).

61. Accordingly, what follows are the facts Plaintiffs contend demonstrates LAI's Lawsuit for which they were found to be prevailing parties for their successful anti-SLAPP motion were "willful and malicious" as evidence of LAI's intent. While much of LAI's litigation conduct would be actionable as intentional torts if not covered by California's litigation privilege found in California Civil Code section 47, subdivision (b), Plaintiffs are not basing their cause of action under 11 U.S.C. § 523(a)(6) for nondischargeability on those intentional torts. Rather, Plaintiffs are relying on the line of post-*Geiger* cases cited above in which bankruptcy courts have found lawsuits that gave rise to the debor's indebtedness seeking protection from bankruptcy as meritless suits to meet the requirement for willful and malicious under Section 523(a)(6).

**SUMMARY OF EVIDENCE OF LAI'S WILLFULNESS IN INTENT TO INJURE**

**A.     LAI Intended to Breach His Fiduciary Duty of Loyalty to WANG by Abandoning Her During an Active Marriage Dissolution Proceeding**

62. LAI, while representing WANG in a divorce proceeding, falsely accused her of lying about approximately $160,000 in financial transactions that her husband had returned to her voluntarily in a *Marvin* distribution to return for WANG's mother and brother. During the hearing, WANG's husband's attorney acknowledged:

Under essentially an informal *Marvin* distribution, Petitioner had or Ms. Wang had asked Mr. Kim [husband] to hold approximately $80,000 of her money that was from a house that got foreclosed on. ¶ My client assumed the loss and also washed out a substantial amount of his 401K at the time approximately half.

(Exhibit E to WANG Decl. [Exhibit A hereto], p. 7:15-22.)

63.     LAI falsely accused WANG of lying about this money even though he represented in open court in San Mateo Superior Court to the judge presiding over the family law case the truth that this money was indeed for WANG's mother and brother, to wit: "Because when they purchase a house her mother loan, um, substantial money to Respondent. So that money was to pay back her mother's loan. And I have e-mail to substantiate that, Your Honor." (Exhibit E to WANG Decl. [Exhibit A hereto], p.. 8:8-15.)

64.     WANG's husband's attorney represented to the judge: "It was verbally confirmed that there were two wire transfers. The first was July 13th, 2015 in the amount of $89,290. The second one was August 13th, 2015 in the amount of $75,000 to Ms. Wang." (Exhibit E to WANG Decl. [Exhibit A hereto], pp. 13:26-14:3.) LAI did not dispute this representation to the San Mateo Superior Court.

65.     Then, after a discussion about support, the judge said: "But I also have he gave her $75,000 in excess that they're telling me." (Exhibit E to WANG Decl. [Exhibit A hereto], p. 17:13-15.) LAI responded: "Honor, that" his brother's money. . . . His brother's money. He placed the money with Daniel for investment purposes. So that's not her money. . . . She placed the money with Daniel. So her brother gave her cash. And she place money with him." (*Id.*, Exhibit E, p. 17:16-25.)

66.     These informal *Marvin* distributions and what they represent, as either conceded or affirmatively articulated by WANG's own husband's lawyer, continued to be asserted as such by WANG in the family law case which was ultimately resolved with no further questions over these *Marvin* distributions. Yet, LAI always claimed WANG lied about the purpose of this money (namely, that the money should have been used to pay his fees) to claim fraud against his own client in his FAC and never brought to the attention of the San Mateo Superior Court that he had misled it by adopting WANG's husband's lawyer's representations on January 25, 2017 in the San Mateo

1    Superior Court's family law hearing.

2        67.    In short, LAI's contention that WANG had lied to him about the purpose of the

3    *Marvin* distributions, had they been true, necessarily meant that he knowingly made the purported

4    false representations WANG made about the source of funds to the San Mateo Superior Court in

5    violation of his ethical rules as an attorney. (Cal. Rule Prof. Conduct 5-200; see also Cal. Bus. &

6    Prof.Code § 6068(d) (codifying lawyer's duty not "to seek to mislead the judge or any judicial

7    officer by an artifice or false statement of fact or law."].)  In other words, there is only two

8    possibilities here: LAI either intentionally lied about WANG or he intentionally lied to the San

9    Mateo Superior Court and never corrected the lie. The failure to correct purported false statement of

10   facts constitutes a willful violation of California Business & Professions Code section 6068,

11   subdivision (d). *Grove v. State Bar,* 63 Cal.2d 312, 315 (1965), citing *Green v. State Bar,* 213 Cal.

12   403, 405 (1931) [concealment of material fact "misleads the judge as effectively as a false statement.

13   . . . No distinction can therefore be drawn among concealment, half-truth, and false statement of

14   fact"].)  LAI's failure to correct to the San Mateo Superior Court what he claims was a lie is a strong

15   inference that it was not a lie and that he simply falsely accused WANG with malice.

16       68.    Indeed, LAI abandoned WANG as his client[2] and sued her based, in part, on a

17   provision in his retainer agreement with her that allowed him to do so if certain conditions were met.

18   LAI had chosen to represent WANG on a contingency basis, opting to have his fees paid through an

19   award of court-awarded fees, to wit: "The fee arrangement, as agreed upon, will be based on an

20   hourly fee in the amount of $300, contingent upon the court's order for attorney's fee and costs to be

21   paid by the other party. (The Attorney will ask the court to order the opposing party to pay for the

22   attorney's fees; the Attorney will not ask the Client to pay for the attorney's fees.)" (Exhibit A to

23   WANG Decl. [Exhibit A hereto].)

24   ///

25   ///

26

27       [2]    In California, client abandonment is "serious misconduct that constitutes a breach of the
28   fiduciary duty owed by an attorney to the client and, accordingly, warrants substantial discipline."
     *Stanley v. State Bar,* 50 Cal.3d 555, 566 (1990).

69.     However, there was another part of the retainer agreement that allowed as follows:

**<u>Our Right to Terminate Representation</u>**

We may terminate our representation (to the extent permitted by the ethical and court rules) at any time if you breach any material term of this agreement or fail to cooperate or follow our advice on a material matter, if conflict of interest develops or is discovered, or if there exists at any time any fact or circumstance that would, in our opinion, render our continuing representation unlawful, unethical, or otherwise inappropriate. If we elect to terminate our representation, you will take all steps reasonably necessary and will cooperate as reasonably required to free us of any further obligation to perform legal services, including the execution of any documents necessary to complete our withdrawal from representation. In such case, you agree to pay for all legal services performed and expenses incurred before the termination of our representation in accordance with the provision of this agreement.

(Exhibit A to WANG Decl. [Exhibit A hereto].)

70.     LAI placed four alternative conditions precedent in his own termination clause of his retainer agreement in order to obtain compensation from WANG in the event any act by her caused the contingency of a court award of fees not to occur: (1) breach any material term; (2) fail to cooperate or follow advice on a material matter; (3) a conflict of interest develops or is discovered; and (4) or continuing representation became unlawful. If, and only if, any of these four conditions occurred, then LAI placed on himself two covenants to perform by withdrawing, not abandoning, to wit: (1) to the extent permitted by the ethical rules and (2) to the extent permitted by court rules. (Exhibit A to WANG Decl. [Exhibit A hereto].) None of the four conditions occurred. Moreover, even if any had, LAI failed to perform by seeking to withdraw pursuant to either of the covenants of his termination clause.

71.     A California attorney retained solely on the basis of a contingency fee agreement may not voluntarily withdraw from representing a client and later seek fees for the reasonable value of services rendered. *Estate of Falco,* 188 Cal.App.3d 1004, 1014 (1987); *Rus, Milband & Smith v. Conkle & Olesten*, 113 Cal.App.4th 656, 675 (2004). To allow an attorney under a contingency fee agreement to withdraw without compulsion and still seek fees from any future recovery is to shift the time, effort and risk of obtaining the recovery (economists would refer to these things as the "costs" of obtaining recovery) from the attorney, who originally agreed to bear those particular costs in the first place, to the client. *Rus, Milband & Smith v. Conkle & Olesten* at 675–76.

72.     There was only one obligation of performance by WANG set forth in the retainer agreement: "You agree to reimburse us for expenses incurred on your behalf." (Exhibit A to WANG Decl. [Exhibit A hereto].) LAI terminated WANG as his client simultaneously with demanding reimbursement of costs, so he breached the retainer agreement before demanding reimbursement of expenses. (WANG Decl., p. 5, ¶16, Exhibit A hereto and Exhibit F thereto.)  LAI never identified, nor was there any, failure to cooperate or failure to follow advice by WANG before he abandoned her.  No conflict of interest existed as of January 25, 2017 and none would have developed had LAI not falsely accused WANG of lying at the January 25, 2017 hearing in the family law case when he abandoned her.  LAI's continued representation of WANG was not unlawful.

73.     In order to obtain fees after withdrawing from a contingency fee representation, counsel must show he or she had to withdraw for ethical reasons and, in fact, withdrew for that justifiable reason. *Falco, supra,* 188 Cal.App.3d at 1015.  Under this heightened standard, in order to recover in quantum meruit after withdrawing from a representation based upon a contingency fee arrangement, an attorney must show the following: (1) counsel's withdrawal was mandatory, not merely permissive, under statute or State Bar rules; (2) the overwhelming and primary motivation for counsel's withdrawal was the obligation to adhere to these ethical imperatives under statute or State Bar rules; (3) counsel commenced the action in good faith; (4) subsequent to counsel's withdrawal, the client obtained recovery; and (5) counsel has demonstrated that his work contributed in some measurable degree towards the client's ultimate recovery. *Falco,* 188 Cal.App.3d at 1016.

74.     The California Rules of Professional Conduct govern whether and how attorneys may withdraw from representing their clients. *Nehad v. Mukasey,* 535 F.3d 962, 970-71 (9th Cir. 2008). The grounds for mandatory withdrawal are extremely limited and include only (1) a client's conducting a defense or asserting a position in litigation without probable cause and for the purpose of harassing or maliciously injuring any person (2), imminent violation of ethical rules or (3) the lawyer's mental or physical impairment. (Cal. Rule Prof. Conduct 3–700(B)(1)-(3).)  LAI did not and could not meet any of these grounds. LAI did not attempt to demonstrate, nor could he, that he had bona fide ethical grounds making his termination of his employment as WANG's attorney mandatory.

Case: 23-51382   Doc# 18   Filed: 12/06/23   Entered: 12/06/23 10:39:37   Page 21 of 44

75.     The intentionality of making a false allegation against his own client, WANG, in the middle of a contested dissolution proceeding in order to exploit the termination clause of his retainer agreement, demonstrates that he desired or intended that the resulting consequences of his act of abandoning her as his lawyer to cause her injury.  The fact that he didn't even bother attempting to meet the conditions he set forth in his own termination clause raises the strong inference that he knew his contention against WANG was false.  Indeed, his writings to WANG shortly after informing her that he was abandoning her strengthens this demonstrated intent to interfere with her ability to obtain substitute representation.

**B.      LAI Intended to Interfere With WANG's Ability to Obtain Representation in the Family Law Matter and Damage WANG's Interest as a Litigant in the Active Family Law Proceeding**

76.     On January 29, 2017, LAI sent WANG another email in which he wrote: ". . . on a friendly note, I want to say that although you have a fair chance of winning this case, your lack of credibility is going to destroy that very chance. [Chinese Characters] God Is watching everything you do. . . .¶Your trip of free-ride on attorneys stops right here. You will not be allowed to defraud other attorneys, and I will assure no other good-hearted attorney will be taken advantage by you." (WANG Decl., p. 6, ¶18, Exhibit A hereto and Exhibit H thereto.)

77.     LAI had the means, but never sought an alternative to obtain his unpaid fees by simply enforcing his contract by accepting the fees from the fee petition he affirmatively filed before abandoning WANG as her lawyer.  This avenue was always available to him by utilizing the procedures clearly set forth in *In re Marriage of Borson, supra,* 37 Cal.App.3d 632, 637 (the law that allows a former attorney the authority to request additional fees and costs after discharge). Instead, LAI initiated suit against WANG on April 3, 2017, alleging a breach contract cause of action. (Exhibit F hereto.)

78.     The attorney-client relationship is a fiduciary one that imposes on the attorney duties of confidentiality and loyalty to the client. *Gutierrez v. Girardi*, 194 Cal.App.4th 925, 932 (2011); *Zador Corp. v. Kwan*, 31 Cal.App.4th 1285, 1293 (1995).  The duty of loyalty requires the attorney " 'to protect his client in every possible way, and it is a violation of that duty for him to assume a position adverse or antagonistic to his client without the latter's free and intelligent consent.' " *Santa*

1  *Clara County Counsel Attys. Assn. v. Woodside*, 7 Cal.4th 525, 548 (1994) (superceded by statute on

2  other grounds, *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment*

3  *Relations Bd.,* 35 Cal.4th 1072, 1077 (2005).) Both duties survive termination of the attorney-client

4  relationship. *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821 (2011).

5       79.     Thus, an attorney "may not do anything which will injuriously affect his former client

6  in any matter in which he formerly represented him nor may he at any time use against his former

7  client knowledge or information acquired by virtue of the previous relationship." *Wutchumna Water*

8  *Co. v. Bailey ,*216 Cal. 564, 573-574 (1932).  An attorney "may not do anything which will

9  injuriously affect [the] former client in any matter in which [the attorney] formerly represented [the

10  client]." *Oasis West Realty, LLC v. Goldman,* 51 Cal.4th 811, 821 (2011). This is so even if the

11  action injurious to the former client does not involve the use or disclosure of confidential

12  information. *People ex rel. Deukmajian v. Brown,* 29 Cal.3d 150, 156 (1981).

13  **C.**     **LAI Intended to Interfere with WANG's Professional Relationship with MELEN as**

14  **Her New Attorney in the Family Law Proceeding by Naming MELEN as a Co-conspirator in LAI's Lawsuit and Accusing WANG of Lying and "Extortion"**

15       80.     In LAI's prayer in his FAC, he only sought $25,776.43 for his fraud, breach of

16  contract and common counts claims, the same amount of the fee petition on file in the family law

17  case. (FAC, Prayer, p. 7 – Exhibit C hereto.) It was only his causes of action against WANG and her

18  lawyers for malicious prosecution and abuse of process did LAI seek damages in excess of $50,000

19  and those claims LAI prayed for punitive damages for "Count 4-5" which were the malicious

20  prosecution and abuse of process causes of action. (*Id.*)

21       81.     Put simply, if LAI's Lawsuit was solely about obtaining unpaid fees, LAI had

22  alternative means to obtain the same amount he was seeking in the San Mateo Superior Court

23  without resorting to suing his client while she was in the middle of a dissolution proceeding.  Rather,

24  LAI lied about WANG's veracity on a subject before the San Mateo Superior Court in the family

25  law case, specifically alleging facts that she had lied to him and, by necessity, the Superior Court –

26  acts he participated in.

27       82.     LAI had threatened WANG explicitly in writing on January 29, 2017, that her

28  purported "lack of credibility was going to destroy" her "very chance" of prevailing in the family

Case: 23-51382   Doc# 18   Filed: 12/06/23   Entered: 12/06/23 10:39:37   Page 23 of 44

law action. (WANG Decl., p. 6, ¶18, Exhibit A hereto and Exhibit H thereto.) Thus, it is clear that LAI knowingly intended that the LAI Lawsuit would cause WANG resulting harm when he viciously attacked WANG's credibility in his FAC that he filed over a year later on January 14, 2019, when the family law case remained pending.

83.     LAI's false contention in his FAC that WANG had "extorted" him in filing a State Bar Complaint and that she had falsely stated the *Marvin* distributions were not for her mother and brother was an extreme breach of his duty of loyalty to a former client. *Gutierrez v. Girardi, supra*, 194 Cal.App.4th at 932; *Zador Corp. v. Kwan*, 31 Cal.App.4th at 1293. Therefore, when evaluating LAI's justification or excuse for taking the action against WANG, particularly seeking tort damages against her for a garden-variety fee dispute, it is necessary to evaluate his conduct in light of his fiduciary duties to WANG during the pendency of the family law case in which he abandoned her as her lawyer.

**D.     LAI Intended to Harm the Professional Relationship of MOORE and WANG in Defense of LAI's Lawsuit**

84.     As a member of the California bar, LAI is presumed to know the law.  "It has long been held that counsel is presumed to know the law." (*Del Real v. City of Riverside*, 95 Cal.App.4th 761, 766 (2002) (*Del Real*) [citing *King v. Superior Court*, 12 Cal.App.2d 501, 509 (1936) (*King*)].)

85.     Civil Code section 1714.10 "prohibits the unauthorized filing of an action for nonexempt civil conspiracy against an attorney based on conduct arising from the representation of a client that is in connection with any attempt to contest or compromise a claim or dispute." (*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 815.)  "The purpose of section 1714.10 is to discourage frivolous claims that an attorney conspired with his or her client to harm another." (*Klotz v. Milbank, Tweed, Hadley & McCloy* (2015) 238 Cal.App.4th 1339, 1350.)

86.     Civil Code section 1714.10 "was enacted to combat 'the use of frivolous conspiracy claims that were brought as a tactical ploy against attorneys and their clients and that were designed to disrupt the attorney-client relationship.' "  *Stueve v. Kahn,* 222 Cal.App.4th 327, 329 (2013) The statute thus performs a " 'gatekeeping' function and requires a plaintiff to establish a reasonable probability of prevailing before he or she may pursue a cause of action against an attorney for a civil

conspiracy with his or her client arising from any attempt to contest or compromise a claim or dispute." *Id.* Therefore, rather than requiring the attorney to defeat the claim by showing it is legally meritless, the plaintiff must make a prima facie showing before being allowed to assert the claim.

87.   Any such claims must be based on a verified petition, that is, one under oath. "The court may allow the filing of a pleading claiming liability based upon such a civil conspiracy *following the filing of a verified petition therefor accompanied by the proposed pleading and supporting affidavits stating the facts upon which the liability is based*...." Civ. Code §1714.10(a).

88.   LAI's knowing refusal to follow the law embodied in Civil Code section 1714.10 demonstrates that he desired or intended that the resulting consequences of his act that Section 1714 is designed to deter and prevent: "to discourage frivolous claims that an attorney conspired with his or her client to harm another" and to prevent the "disrupt[ion of] the attorney-client relationship." *Klotz, supra,* 238 Cal.App.4th at 1350; *Stueve, supra,* 222 Cal.App.4th at 329. Indeed, LAI had threatened WANG that she "will not be allowed to defraud other attorneys, and I will assure no other good-hearted attorney will be taken advantage by" her just months before on January 29, 2017. Any lawyers that did assist WANG, therefore, could not be a "good-hearted attorney" following the logic inherent in LAI's written threat to her. (WANG Decl., p. 6, ¶18, Exhibit A hereto and Exhibit H thereto.)

89.   Morever, the surreptitious nature in which LAI added MOORE and MELEN through a DOE amendment rather than simply name them in the body of the FAC reflects a conscious effort to avoid the dictates of  Civil Code section 1714.10, subdivision (a) in filing a verified petition before naming WANG's attorneys as defendants in a conspiracy with her.  While the tactic was obviously lame in its execution, it demonstrates LAI's knowing subversion of the law and his abuse of process.  LAI's acts in naming MOORE and MELEN while these lawyers were representing WANG in LAI's fee dispute with her demonstrates he consciously intended to bring about the very harm to the attorney-client relationship WANG had with MOORE and MELEN.  MOORE was required, at that point, to obtain written informed consent from WANG through the use of an interpreter (WANG's first language is Chinese) and revise his retainer agreement with her as a consequence given he was accused of engaging in a conspiracy with WANG to carry-out tortious

conduct against LAI in which he sought punitive damages against all three.

**SUMMARY OF EVIDENCE OF LAI'S MALICE IN HIS INTENT TO INJURE**

**A.     LAI's Lawsuit Charging WANG, MOORE and MELEN with Moral Turpitude Crimes Were False**

90.     LAI's factual allegations against WANG in his FAC was not confined simply to his false contention that WANG had lied about the money for her mother and brother, but that she committed the crime of "extortion" in filing "a malicious and false bar complaint" against him in May 2017. (Exhibit C, FAC p. 4, ¶26.)  LAI averred in his FAC that MOORE and MELEN engaged in "aiding and abetting her [WANG] in committing repeated perjuries and a forgery, in furtherance of their own financial gains, such as Melen's requests for attorney's fees from the family court." (Exhibit C, FAC, p. 7, ¶47.)

91.     "Perjury" is a crime in California found in Penal Code section 118 as" A person is guilty of perjury if he or she "willfully states as true any material matter which he or she knows to be false." Cal. Pen. Code, § 118, subd. (a).  In California, a forgery is a " ' "writing which falsely purports to be the writing of another," ' and is executed with the intent to defraud." *Schiavon v. Arnaudo Brothers,* 84 Cal.App.4th 374, 382 (2000).  California's Penal Code defines forgery as requiring a signer's knowledge that he or she lacks authority to sign the name of another person, as well as intent to defraud. Pen. Code, § 470.

92.     Civil conspiracy in California is not an independent tort. Instead, it is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. [Citation.] In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 510–511 (1994).

93.     "[T]he crime of extortion involves moral turpitude." *Libarian v. State Bar,* 38 Cal.2d 328, 329–330 (1952); *Barton v. State Bar,* 2 Cal.2d 294, 297 (1935) California's Supreme Court has "repeatedly regarded the offense of perjury, which entails a willful false statement, contrary to oath,

Case: 23-51382    Doc# 18    Filed: 12/06/23    Entered: 12/06/23 10:39:37    Page 26 of
44

as to a material matter which one knows to be false, to involve moral turpitude. *In re Kristovich,* 18 Cal.3d 468 (1976) (citing *In re Rothrock,* 16 Cal.2d 449, 454 (1940); *In re Allen,* 52 Cal.2d 762, 768 (1959) (soliciting others to commit perjury).) When such false allegations are directed toward a licensed attorney, the nature of the crime alleged is sufficiently egregious to justify disbarment. *In re Aquino,* 49 Cal.3d 1122, 1130 (1989). Knowingly countenancing perjury is conduct "unworthy of the office of attorney." *In re Allen,* 52 Cal.2d 762, 768 (1959). Misrepresentation/falsification of evidence is also a crime (Cal. Pen. Code §§ 133 & 141, subd (a)) and, when committed by an attorney, is a violation of Business and Professions Code section 6106, an act constituting moral turpitude. *In the Matter of Murray,* 5 Cal. State Bar Ct. Rptr. 479, 483 (Review Dept. 2016).

94. The fact that LAI knowingly made false allegations that MOORE and MELEN had conspired to commit crimes with WANG that were made without satisfying the very protections under California law embodied in Civil Code section 1714.10, amply demonstrates malice for purposes of establishing non-dischargeability under the malice prong of § 523(a)(6). In *Ormsby v. First Am. Title Co. (In re Ormsby),* 591 F.3d 1199 (9th Cir. 2010), the Ninth Circuit determined that a debtor's decision to act in violation of a law despite knowing the legal way to conduct business satisfied the malice prong of § 523(a)(6) by demonstrating that "the debtor has a subjective motive to inflict injury or when the debtor believes the injury is substantially certain to result from his own conduct." *Id.*, at 1207, 1209.

95. Further, "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Miller v. J.D. Abrams Inc. (In re Miller),* 156 F.3d 598, 606 (5th Cir.1998). The objective test analyzes whether a reasonable person would determine that a defendant's actions were substantially certain to cause harm. See *Mann Beacken, LLP v. Powers (In re Powers),* 421 B.R. 326, 335 (Bankr.W.D.Tex.2009). False accusations of criminal conduct can create an objective substantial certainty of harm against the accused. See *In re Scarbrough,* 516 B.R. 897, 911 (W.D. Tex. 2014); *McClendon v. Springfield,* 505 B.R. 786, 792–93 (E.D.Tex.2013). As one California court put it:

> Attorneys, like police officers, frequently deal with hostile members of the public, including parties to whom their clients are adverse and, sometimes, the clients themselves. (See generally *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 110

Case: 23-51382   Doc# 18   Filed: 12/06/23   Entered: 12/06/23 10:39:37   Page 27 of
44

Cal.Rptr.2d 370, 28 P.3d 116.) The motivation for such persons to make false accusations against attorneys is strong, and the potential harm to an attorney's reputation, and ultimately his or her right to practice law, is significant.

*Walker v. Kiousis,* 93 Cal.App.4th 1432, 1453 (2001).

### 1. The Assertion That WANG's State Bar Complaint Extorted Him is False

96. California's Business & Prof.Code section 6043.5, subdivision (a) states: "Every person who reports to the State Bar or causes a complaint to be filed with the State Bar that an attorney has engaged in professional misconduct, knowing the report or complaint to be false and malicious, is guilty of a misdemeanor." "Extortion is the obtaining of property from another, with his consent ... induced by a wrongful use of force or fear...." Cal. Pen.Code, § 518. Fear, for purposes of extortion "may be induced by a threat, either: [¶] ... [¶] 2. To accuse the individual threatened ... of any crime; or, [¶] 3. To expose, or impute to him ... any deformity, disgrace or crime[.]" Cal. Pen.Code, § 519. "Every person who, with intent to extort any money or other property from another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519, is punishable in the same manner as if such money or property were actually obtained by means of such threat." Cal. Pen.Code, § 523.

97. California's Supreme Court's decision in *Flatley v. Mauro* (2006) 39 Cal.4th 299 held that, extortion in the context of the filing or threatened filing of a State Bar Complaint noted that (1) the threat made by an extortionist does not have to succeed in producing an exchange of money in order to constitute extortion; (2) the action that is threatened unless money is paid may itself not be an illegal action but instead, it is the coupling of the threat of that action with the demand for money that constitutes the illegality; and (3) it is immaterial to the crime of extortion that the purpose of the threat is to collect money justly due the extortionist. *Id.* at pp. 326–327.

98. Notably absent from WANG's State Bar Complaint (Exhibit F to WANG's Opp. Decl. – Exhibit B hereto) is any threat at all, much less one about money. There was nothing extortionate about WANG's State Bar Complaint and stating so in his FAC was patently false.

### 2. Proof That LAI Knew His Allegations Against MELEN's Involvement with WANG's State Bar Complaint was False

99.     In his FAC, LAI averred that MELEN "knowingly gave substantial assistance to Wang aiding and abetting her in evading process and instituting the false bar complaint." The State Bar Complaint WANG made against LAI in May 2017 (Exhibit F to WANG's Opp. Decl. – Exhibit B hereto) is replete with nine (9) separate references to Elizabeth C. Peterson, Esq., of Wilson, Sonsini, Goodrich and Rosati PC, who was acting as WANG's pro bono lawyer for her and was identified as a witness who would support her claim against LAI. During the course of LAI's representation, WANG had to disclose to LAI that she had sought the help of Ms. Peterson, to handle a restraining order against a person who had raped her. WANG desired to keep the matter private because it was severe, involved weapons and threats to her and her daughter. LAI quipped: "You got this restraining order because you are LUCKY, not because your attorney Elizabeth C. Peterson was great, or your case was strong. If I was the other person's attorney, your restraining order would not be granted because you do not have any evidence [of the rape] to prove to the court." (State Bar Complaint, ¶19, Exhibit F to WANG's Opp. Decl. – Exhibit B hereto)

100.     LAI was, therefore, on notice that it was Elizabeth C. Peterson who had encouraged WANG to make the State Bar Complaint, not MELEN. The absence of Elizabeth C. Peterson as a named defendant in LAI's FAC is telling: Elizabeth C. Peterson, Esq., had been appointed to the Santa Clara County Superior Court bench by Governor Jerry Brown on December 23, 2016[3], and had been fully occupying her position as the Honorable Elizabeth C. Peterson for approximately two years when LAI filed his FAC on January 14, 2019.

### 3. LAI's Accusation That MOORE Had "Knowingly" Misrepresented (sic) the Contents of the Transcript of the San Mateo Superior Court's January 25, 2017 Family Law Hearing is Demonstrably False

101.     In his FAC, LAI averred that MOORE "knowingly mispresented (sic) the transcript of the family court hearing, and then much more gravely, intentionally presented a falsified document manufactured by Wang to the panel of arbitrators." (Exhibit C – FAC, pp. 5-6, ¶37.) The transcript LAI refers to is the same transcript set forth above (Exhibit E to WANG Decl. [Exhibit A

---

[3]     See https://www.ca.gov/archive/gov39/2016/12/23/news19640/index.html

hereto]) and which speaks for itself. See *Matter of Dempsey,* 632 F.Supp. 908, 925 (N.D. Cal. 1986) (counsel's [here, LAI] "digressions, circular arguments, impertinent remarks, and general confusion appear throughout the transcript.")

102.    There is no reading of the San Mateo Superior Court's January 25, 2017 family law hearing (Exhibit E to WANG Decl. [Exhibit A hereto]) that is contrary to the conclusion that the very two financial transactions identified therein as the *Marvin* distributions ($89,290 and $75,000, respectively) that WANG's husband's lawyer represented was money returned to WANG for her mother and brother which LAI eventually conceded to be the case on the record in that transcript was the same money LAI alleged in his FAC that was what made WANG's three representations to him false, to wit: "(1) she received no distribution of assets before separation; (2) she has no funds to retain an attorney for her divorce case; (3) she was in arrears of her rent, and had no sufficient funds even to buy food." (Exhibit C, FAC, p. 3, ¶¶9-14.)  LAI has always maintained that WANG lied to him about these funds and that those funds that were to pay back her mother and brother should have been used to pay him a fee rather than he agree to represent her on a contingency basis "out of compassion." (Exhibit C, FAC, p. 3, ¶14.)

103.    There was no truth to LAI's false accusation that MOORE "knowingly mispresented (sic) the transcript of the family court hearing" and LAI knew that the accusation was false. Moreover, LAI knew that any such contention that MOORE had misrepresented what was stated in a hearing transcript that any potential arbitrator would have read (but did not due to the aborted MFA) would have been demonstrated as such had the MFA gone forward. Finally, LAI knew that statements of counsel in a brief is not evidence  See *Muskan Food & Fuel, Inc. v. City of Fresno,* 69 Cal.App.5th 372, 389–390 (2021) ("Statements by an attorney, whether made in court or in a brief, are not evidence"); *Van de Kamp v. Bank of America,* 204 Cal.App.3d 819, 843 (1988) (same); Cal. Evid. Code, § 140 (definition of evidence).

### 4.    LAI's Accusation That MOORE Had Intentionally Presented a Falsified Document Manufactured by WANG to the Panel of Arbitrators is Demonstrably False

104.    In his FAC, LAI's obtuse reference that MOORE allegedly "intentionally presented a falsified document manufactured by Wang to the panel of arbitrators" (Exhibit C – FAC, p. 5, ¶37)

was not understood by anyone other than LAI at the time he filed his FAC.  However, LAI had made an issue out of a spreadsheeet in WANG's MFA brief in his reply brief in the Mandatory Fee Arbitration. In a the Mandatory Fee Arbitration brief, MOORE had set forth as follows:

> After he terminated Petitioner as his client, Petitioner's new counsel (Michelle Melen, Esq.) found in the boxes Respondent dumped in public at a low-income public clinic lobby's wall, Ms. Melen found all the evidence necessary for Respondent to have understood the financial arrangement described above: bank statements reflecting the transactions ($75,000 on July 13, 2015 and $89,290 on August 13, 2015 [sic]) which he obviously ignored. (Exhibit E hereto.)

Exhibit I to MOORE Declaration in Support of Opposition to Plaintiff X. Young Lai's Renewed Motion to Lift Stay And to Appoint a Forensic Expert ["MOORE's Opp. Decl."] – Exhibit G hereto.

105.    Exhibit E contained this spreadsheet which was placed inadvertently and is not a bank statement but a photo of a computer printout that was the first page on top of bank statements. A true and correct copy of said spreadsheet and the bank records that followed it are attached as Exibit A to WANG's Opp. Decl. – Exhibit B hereto. As one can discern from the photo of the spreadsheet (Exhibit E), it contained no dates on it that were July 13, 2015 or August 13, 2015. Rather, the spreadsheet has the designations "7/14/15" and "8/14/15" corresponding to the figures "$89,290"  and "$75,000," respectively, which MOORE had transposed.  This demonstrated that MOORE could not be referring to the spreadsheet when he wrote the above passage referencing Exhibit E since dates  July 13, 2015 and August 13, 2015 do not appear on the spreadsheet.  When MOORE assembled the brief, he mistakenly selected the photo of the spreadsheet which was on top of a stack of bank records. As one can casually observe from the spreadsheet, it does not have any insignia from a bank and is only identified at the top of the spreadsheet as "Discover Bank Account Activity." The Discover bank statement underneath the spreadsheet is what MOORE intended to present at the hearing and which has the dates  July 13, 2015 and August 13, 2015 as the "effective" dates of the "$89,290"  and "$75,000," transactions. (MOORE's Opp. Decl., p. 6, ¶20 – Exhibit G hereto.)

106.    The spreadsheet was irrelevant because it was not going to be used as evidence since WANG had provided MOORE the actual banking statements in which the wire transfers and withdrawals could be traced which would be more reliable as actual evidence which WANG could

present at any hearing on the Mandatory Fee Arbitration. hearing never occurred. But the Mandatory Fee Arbitration hearing never commenced due to the inability of one of the arbitrators to attend the hearing. Ultimately, WANG abandoned the Mandatory Fee Arbitration. No hearing ever occurred, nor evidence submitted or received, nor any findings made nor arbitration award determined. (MOORE's Opp. Decl., pp. 6-7, ¶¶21-22 – Exhibit G hereto.)

107. Yet, it was not the actual spreadsheet that LAI claimed constituted a fraud by WANG which he further contends MOORE "intentionally presented." Rather, it was the handwritten notes on the spreadsheet that LAI claimed proved some sort of attempted fraud on the arbitration panel at the Mandatory Fee Arbitration which never took place. The contention falls apart by the mere fact that MOORE never made reference to the notations on the spreadsheet nor could he – the vast majority of the notations are in Chinese and MOORE neither read nor spoke Chinese. Moreover, LAI never produced any evidence that any member of the arbitration panel for the MFA could have comprehended the Chinese characters. Put simply, LAI knew that MOORE could not have possibly "intentionally presented" the handwritten Chinese characters without the prospective reader of the spreadsheet having the ability to read Chinese. (MOORE's Opp. Decl., p. 7, ¶¶22 – Exhibit G hereto.)

108. In short, LAI knew MOORE could not have possibly "intentionally presented" Chinese characters on a spreadsheet and no evidence was presented that anyone other than LAI and WANG could read Chinese. Indeed, this spreadsheet was not "presented" at all in the manner LAI contended since the arbitration panel never convened to consider it and could not comprehend the hidden meaning LAI ascribed to it had the arbitration occurred.

**B.     The Superior Court and the Court of Appeal Ruled that LAI Presented no Evidence That WANG, MOORE and MELEN Engaged in Criminal Conduct and LAI is Collaterally Estopped from Claiming Otherwise**

109. "Collateral estoppel ... has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 (1979). The Supreme Court has held that collateral estoppel principles apply in discharge exception proceedings under § 523(a). *Grogan v. Garner,* 498 U.S. 279, 284 n. 11 (1991). Although state court judgments

on questions of fraud, willfulness, malice, and other issues may not bind a bankruptcy court in a dischargeability action, under certain conditions debtors will be collaterally estopped from re-litigating factual determinations made in connection with such judgments in the bankruptcy court. See, e.g., *Reeves v. Davis (In re Davis),* 638 F.3d 549 (7th Cir.2011) (factual finding that contract included a term was binding on bankruptcy court, but state court litigation did not include finding of debtor's intent). The Supreme Court has explained that: "Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *New Hampshire v. Maine,* 532 U.S. 742, 748–49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

110.    In order for a prior judgment to be entitled to collateral estoppel effect, five elements must be met: (1) The issue sought to be precluded from relitigation must be identical to that decided in a former proceeding; (2) The issue must have been actually litigated in the former proceeding; (3) It must have been necessarily decided in the former proceeding; (4) The decision in the former proceeding must be final and on the merits; and (5) The party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. *Clark v. Bear Stearns & Co., Inc.,* 966 F.2d 1318, 1320 (9th Cir.1992).

111.    The party seeking to assert collateral estoppel has the burden of proving all the requisites for its application. To sustain this burden, a party must introduce a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action. *In re Kelly,* 182 B.R. 255, 258 (9th Cir. BAP 1995) (citing *Spilman v. Harley,* 656 F.2d 224, 227–28 (6th Cir.1981).)

112.    Here, there are two issues actually litigated in the Santa Clara Superior Court and the Sixth District Court of Appeal that are substantially similar to the issues which are before this bankruptcy court on the issue of "willful and malicious" for (1) the lack of conclusive evidence that WANG, MOORE and/or MELEN engaged in the criminal acts LAI charged them with committing; and (2) the lack of even "minimal merit" supporting LAI's tort theories of abuse of process, malicious prosecution and conspiracy to commit same.  The first of these two issues are addressed immediately following this paragraph.  The second of these two issues are addressed starting at

Paragraph D, *infra.*

113. LAI chose to not just accuse WANG, MOORE and MELEN of the torts of abuse of process, malicious prosecution and conspiracy to commit same, but he elevated his false intentional torts against them by alleging that they engaged in the ***crimes*** of perjury, subornation of perjury, falsification of evidence, and extortion. (Emphasis added.) He did so because of the very substantive law that applies under California's anti-SLAPP law. It was a strategic decision by LAI and not a mistake. The term "willful," according to the legislative history of Section 523(a)(6) means "deliberate or intentional." *In re Kelly, supra,* 182 B.R. at 259 (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 365 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6320–21; S.Rep. No. 989, 95th Cong., 2d Sess. 79 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5865.)

114. It was certain to both the Santa Clara Superior Court and the Sixth District Court of Appeal that LAI argued that WANG, MOORE and MELEN should not be afforded protection under the anti-SLAPP statute because their conduct was "illegal as a matter of law" within the meaning of *Flatley v. Mauro,* 39 Cal.4th 299, 326 (2006). (LAI's Opposition to Special Motion to Strike, p. 3 – Exhibit H hereto.)

115. In granting WANG, MOORE and MELEN's special motion to strike, Judge Kirwin ruled as follows:

> Plaintiff Lai does not demonstrate the falsity of the State Bar complaint nor does he establish that any of the defendants knew the State Bar complaint to be false and malicious. Nor has plaintiff demonstrated defendants Moore and Melen aided and abetted or conspired with defendant Wang in the filing of the State Bar complaint. . . .
>
> ¶Plaintiff Lai argues further that the defendants Moore and Melen's underlying conduct was illegal because they committed perjury, subornation of perjury, falsification of evidence, and extortion. (Footnotes omitted) . . .
>
> ¶Lai's evidence does not conclusively establish, as a matter of law, any illegality by defendants Moore or Melen. . . .
>
> ¶Consequently, plaintiff Lai has not made the necessary showing that defendants Moore and Melen engaged in any illegal conduct as a matter of law, either through defendants' concession or by uncontroverted and conclusive evidence.

(Judge Kirwin's May 9, 2019 Order, pp. 10-12 – Exhibit I hereto.)

///

///

116. The Sixth Appellate District was in accord:

Lai maintains defendants' conduct was not protected because they intentionally engaged in criminal activity in the fee arbitration. He relies primarily on the California Supreme Court's decision in *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*). . . .

¶In this case, defendants have not conceded they engaged in illegal activity, and Lai has produced no evidence that conclusively establishes any illegality as a matter of law. . . . Lai failed to present any evidence of forgery. Instead of showing that any document was fraudulently altered or ante-dated, Lai contends that defendants cited a document in a misleading fashion. Therefore, *Flatley* does not assist Lai. . . .

¶Wang's e-mail stated she wished to resolve the fee dispute through arbitration, that she believed his fees were unconscionable, and she was " 'contemplating filing a complaint against [Lai] in [S]tate [B]ar court.' " Her e-mail does not demonstrate as a matter of law that she committed extortion.

(Sixth Appellate District Opinion, pp. 11-13 – Exhibit J hereto.)

117. Under *Flatley, supra,* in order for WANG, MOORE and MELEN to have not engaged in protected activity under California's anti-SLAPP statute, it was incumbent upon LAI to demonstrate that either WANG, MOORE and MELEN conceded they had engaged in illegal conduct or demonstrated that WANG, MOORE and MELEN had engaged in illegal conduct as a matter of law, e.g., the evidence "conclusively establishes" as much. *Flatley, supra,* 39 Cal.4th at p. 320.

118. The Superior Court ruled:

Plaintiff Lai contends defendants Moore and Melen's underlying actions were illegal. . . . ¶[T]he illegality must be conceded or demonstrated as a matter of law. Plaintiff **Lai clearly understands this point in citing to** *Flatley v. Mauro* (2006) 39 Cal.4th 299, 316[.] . . . ¶Plaintiff Lai argues further that the defendants Moore and Melen's underlying conduct was illegal because they committed perjury, subornation of perjury, falsification of evidence, and extortion. . . . Defendants Moore and Melen have made no admission, tacit or otherwise, of the allegations set forth in plaintiff Lai's FAC. . . . ¶Lai's evidence does not conclusively establish, as a matter of law, any illegality by defendants Moore or Melen.

(Judge Kirwin's May 9, 2019 Order, pp. 9, 11 – Exhibit I hereto [emphasis added].)

119. Accordingly, LAI is estopped from asserting that the LAI Lawsuit did not arise out of WANG, MOORE and MELEN's protected conduct because there was conclusive proof that they had engaged in the illegal conduct he alleged against them. LAI lost that legal issue. As demonstrated above, there was no truth to the factual contentions anyway. Hence, LAI engaged in willful and malicious activity in the LAI Lawsuit by claiming WANG, MOORE and MELEN had

engaged in criminal activity implicating moral turpitude, which was without legal or factual merit.

120.    It is axiomatic that a plaintiff with a legitimate basis to assert the intentional torts of abuse of process, malicious prosecution and conspiracy to commit same need not also claim the underlying conduct giving rise to those torts were committed by means of the crimes of perjury, subornation of perjury, falsification of evidence, and extortion, particularly given the gravamen of LAI's claims involving a garden-variety fee dispute.  Rather, the gratuitous and cavalier accusations of crimes of moral turpitude by LAI reflected malice on his part.

121.    This discrete issue, namely, that LAI knew that neither WANG, MOORE or MELEN had conceded any criminal conduct nor could he prove any of the elements of the crimes he attributed to them with conclusive evidence, is identical to the issue of "willfulness" ("deliberate or intentional") for purposes of Section 523(a)(6) which, under *Flatley*, was an issue actually litigated and necessarily decided by the Superior Court and the Court of Appeal. (Exhibits H and I hereto.) The Sixth Appellate District's Opinion was issued on May 10, 2023 (Exhibit J), and became final 30 days thereafter since no rehearing was sought nor granted. See Cal.Const. Art. VI § 3; Cal. Rules of Court, Rule 8.264(b).  LAI is therefore collaterally estopped from contending WANG, MOORE or MELEN committed crimes as justification for the LAI Lawsuit, which this Court can infer was a willfully false accusation which LAI intended harm thereby.

**C.    LAI Intended to Present Frivolous Causes of Action Against WANG, MOORE and MELEN Which He Knew He Could Not Meet the Basic Elements of the Torts Alleged in Order to Achieve His Malicious Objective – to Interfere with the Attorney-client Relationship**

122.    LAI alleged that the conduct related to the State Bar Complaint and the MFA were actionable as abuse of process and malicious prosecution for these two causes of action. (FAC, pp. 4-6, ¶¶24-45 – Exhibit C hereto.)  Yet, not only did LAI know that the factual allegations underlying these alleged torts were false, he is charged with knowing that he could not possibly meet the essential elements for each of these causes of action. *Del Real, supra,* 95 Cal.App.4th at 766; *King, supra,* 12 Cal.App.2d at 509.

///

///

**1.  LAI Knew He Could Not Allege or Prove the Elements for Actionable Abuse of Process**

123.  "The common law tort of abuse of process arises when one uses the court's process for a purpose other than that for which the process was designed.... [¶] '[T]he essence of the tort [is] ... misuse of the power of the court; it is an act done in the name of the court and under its authority for the purpose of perpetrating an injustice.' [Citation.] To succeed in an action for abuse of process, a litigant must establish that the defendant (1) contemplated an ulterior motive in using the process, and (2) committed a willful act in the use of the process not proper in the regular conduct of the proceedings." *Rusheen v. Cohen,* 37 Cal.4th 1048, 1056–1057 (2006).

124.  Where a "defendant t[akes] no action pursuant to authority of court, directly or by ancillary proceedings, no judicial process [i]s abused." *Meadows v. Bakersfield S. & L. Assn.,* 250 Cal.App.2d 749, 753 (1967). The State Bar of California is not a court.  Neither is an arbitration under the Mandatory Fee Arbitration Act, particularly one that never took place.

125.  Thus, it has been held "Application of the tort to administrative proceedings would not serve the purpose of the tort, which is to preserve the integrity of the court." *Stolz v. Wong Communications Limited Partnership,* 25 Cal.App.4th 1811, 1823 (1994). Since there was no allegation in LAI's FAC that WANG had misused the power of the court either with the State Bar Complaint or the MFA, LAI could not have stated a legally sufficient claim for abuse of process.  As a licensed and practicing attorney, he is charged with knowing the law. *Del Real, supra,* 95 Cal.App.4th at 766; *King, supra,* 12 Cal.App.2d at 509.

**2.  LAI Knew He Could Not Allege or Prove the Elements for Actionable Malicious Prosecution**

126.  A plaintiff seeking damages for malicious prosecution must plead and prove the prior action (1) terminated in his favor; (2) was brought without probable cause; and (3) was initiated with malice. *Bertero v. National General Corp.,* 13 Cal.3d 43, 50 (1974).  It is the burden on the plaintiff making a claim for malicious prosecution to state a prima facie case for the lack of probable cause. *Soukup v. Law Offices of Herbert Hafif,* 39 Cal.4th 260 (2006).

127.  Again, being a license and practicing attorney, LAI is charged with knowing that he could not overcome the authority in *Lebbos v. State Bar*, 165 Cal.App.3d 656 (1985), which holds

that a State Bar Complaint does not constitute a "prior action" for purposes of malicious prosecution claim where there was no initiation of any formal proceedings. *Id.,* at 670-671.

128.    In addition, it was LAI that sued WANG in Superior Court over a fee dispute without providing WANG the required notice under the Mandatory Fee Arbitration Act of her right to arbitration under the Act. Cal. Bus. & Prof.Code, § 6201, subd. (a). While LAI claimed he provided the notice, he never presented any evidence that he did to the Superior Court. As such, MELEN's petition for MFA for WANG was a defensive use of a right California's legislature provided to consumers of legal services.

129.    Courts have concluded that subsidiary procedural actions or purely defensive actions cannot be the basis for malicious prosecution claims. *Merlet v. Rizzo,* 64 Cal.App.4th 53, 59 (1998). "The reason the courts have held that a malicious prosecution action cannot be grounded upon actions taken within pending litigation is that permitting such a cause of action would disrupt the ongoing lawsuit by injecting tort claims against the parties' lawyers and because the appropriate remedy for actions taken within a lawsuit lies in the invocation of the court's broad powers to control judicial proceedings. [Citation.]" *Adams v. Superior Court,* 2 Cal.App.4th 521, 528 (1992).

130.    Thus, like MFA, where adversarial administrative proceedings are subsidiary procedural actions and defensive in nature, it is not a "prior proceeding" for malicious prosecution purposes. *Idell v. Goodman,* 224 Cal.App.3d 262, 272–273 (1990). Courts "have long 'refused to recognize a tort of malicious defense'." *Coleman v. Gulf Ins. Group*, 41 Cal.3d 782, 794, fn. 9 (1986) (quoting *Bertero v. National General Corp., supra,* 13 Cal.3d at 52) because creation of such a tort would jeopardize the "right of a defendant, involuntarily hauled into court, to conduct a vigorous defense." *Bertero, supra,* at p. 52.

131.    "It is hornbook law that the plaintiff in a malicious prosecution action must plead and prove that the prior judicial proceeding of which he complains terminated in his favor." Babb v. Superior Court, 3 Cal.3d 841, 845 (1971). In an action grounded on malicious prosecution not only must the prosecution be done with malice and without probable cause, but it is equally essential that there be a final termination of the proceeding in favor of the plaintiff. *White v. Brinkman,* 23 Cal.App.2d 307, 318 (1937).

132. Termination must relate to the merits of the action by reflecting either on the innocence of or lack of responsibility for the misconduct alleged against him. *Lackner v. LaCroix* 25 Cal.3d 747, 751 (1979); *Contemporary Services Corp. v. Staff Pro Inc.,* 152 Cal.App.4th 1043, 1056 (2007). The test is whether the dismissal indicates " ' "the opinion of someone, either the trial court or the prosecution party, that the action lacked merit or if pursued would result in a decision in favor of the defendant,"'" 'or simply involves technical procedural or other reasons that are not inconsistent with the defendant's guilt.' " *Contemporary Services Corp., supra,* 152 Cal.App.4th at 1056. When a proceeding is terminated "other than on the merits, the reasons underlying the termination must be examined to see if it reflects the opinion of the court or the prosecuting party that the action would not succeed." *Fuentes v. Berry,* 38 Cal.App.4th 1800, 1808 (1995); see also *Sierra Club Found. v. Graham,* 72 Cal.App.4th 1135, 1149 (1999) ("The element of favorable termination is for the court to decide ....".)

133. Here, the "termination" of the MFA was its voluntary withdrawal of an alternative means to adjudicate the fee dispute that would end up costing WANG more money if it wasn't binding. "[A] binding arbitration award is not meaningless." *Liska v. The Arns Law Firm,* 117 Cal.App.4th 275, 287 (2004) ("Having agreed that the award will be binding, neither party may seek to undo the award by instituting legal proceedings challenging the amount of fees to which the attorneys are entitled.") Thus, attorney LAI is charged with knowing that no favorable termination in favor of LAI occurred by foregoing non binding MFA. *Del Real, supra,* 95 Cal.App.4th at 766; *King, supra,* 12 Cal.App.2d at 509.

**D. The Superior Court and the Court of Appeal Ruled that LAI Presented no Evidence That Would Support Even "Minimal Merit" in His Abuse of Process and Malicious Prosecution Claims Against WANG, MOORE and MELEN and LAI is Collaterally Estopped from Claiming Otherwise**

134. Because WANG, MOORE and MELEN met their initial burden of showing that LAI's malicious prosecution, abuse of process, and conspiracy claims arose from protected activity, the burden shifted to LAI to demonstrate a probability of prevailing on the merits by showing that his claims have " 'at least "minimal merit." ' " *Bonni v. St. Joseph Health System,* 11 Cal.5th 995, 1009 (2021). LAI's burden at this second anti-SLAPP step was "a low one, requiring only a

showing that a cause of action has at least 'minimal merit within the meaning of the anti-SLAPP statute' " *Monster Energy Co. v. Schechter,* 7 Cal.5th 781, 793 (2019).

135.    The Superior Court ruled:

Lai . . .  offers no argument to address [WANG, MOORE and MELEN]'s point that a State Bar complaint, without the initiation of any formal proceedings, does not constitute a prior action for purposes of malicious prosecution [under *Lebbos v. State Bar*, *supra,* 165 Cal.App.3d 656].

Thus, plaintiff Lai is left with the fee arbitration as the sole basis for his claim of malicious prosecution. However, plaintiff Lai has not proffered any admissible evidence to support a claim for malicious prosecution based upon the fee arbitration. Notably absent is any admissible evidence that defendants Moore and Melen initiated or continued the fee arbitration without probable cause or that defendants Moore and Melen initiated the fee arbitration with malice. Plaintiff Lai has not met his burden of demonstrating a probability of prevailing on the claim for malicious prosecution against defendants Moore and Melen.

Here, plaintiff Lai alleges, "The forged document and the intentional misrepresentations alleged herein were not designed to settle a fee dispute but to delay the resolution of the present action, to burden Plaintiff financially, to harass Plaintiff, and to pressure plaintiff to give up valid claims . . . . " (FAC, ¶43.) Again, plaintiff Lai directs the court to his fee arbitration statement and the arguments contained therein. (See ¶2 and Exh. A to the Declaration Lai.) However, the court finds nothing in Lai's fee arbitration statement to support a prima facie showing that defendants entertained any ulterior motive or purpose in commencing fee arbitration or in presenting any argument in connection therewith. Plaintiff Lai has not met his burden of demonstrating a probability of prevailing on the claim for abuse of process against defendants Moore and Melen.

Plaintiff Lai makes no showing whatsoever concerning defendants Moore and Melen's participation in a conspiracy. Also notably absent is any admissible evidence of any damage suffered by plaintiff Lai as a result of the operation of the conspiracy. Plaintiff Lai has not met his burden of demonstrating a probability of prevailing on the claim for conspiracy against defendants Moore and Melen.

(Judge Kirwin's May 9, 2019 Order, pp. 13–17 – Exhibit I hereto.)

136.    The Sixth Appellate District was in accord:

We conclude that Lai cannot prove his malicious prosecution claim has minimal merit because it is predicated on the fee arbitration, which does not constitute a "prior action" for purposes of the tort of malicious prosecution. (Footnote omitted.) We therefore affirm the trial court's ruling granting defendants' special motions to strike Lai's malicious prosecution claim.

¶Since there is no allegation in the abuse of process claim that defendants misused the power of the court as it relates to the fee arbitration, Lai has failed to show that his claim for abuse of process based on the fee arbitration has minimal merit.

¶Based on our review of the record, we decide Lai did not substantiate his allegations with any evidence that Melen improperly presented declarations in the dissolution action. (Footnote omitted.) . . . ¶For these reasons, we decide that Lai has failed to

show that his abuse of process cause of action has minimal merit. (Footnote omitted.)

¶Lai's complaint alleged liability of the defendants under a conspiracy theory and the trial court appropriately evaluated that claim. (See *Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 416 [evaluating conspiracy claim in anti-SLAPP context].)

Moreover, as in *Contreras,* Lai's conspiracy count was subject to being stricken under the anti-SLAPP statute because it relates to only protected conduct (in the arbitration and dissolution action). Having independently reviewed the record, we agree with the trial court that Lai failed to show that his conspiracy claim possesses minimal merit.

(Sixth Appellate District Opinion, pp. 18-23 – Exhibit J hereto.)

137.    The factual/legal issue already litigated, that LAI's causes of action for abuse of process, malicious prosecution and conspiracy against WANG, MOORE and MELEN lacked even minimal merit under such a low standard under California law, provides a sufficient record in this case to establish that LAI had the requisite intent to injure under 11 U.S.C. § 523(a)(6). *Dekhtyar v. Chernyavsky (In re Dekhtyar),* 2019 WL 1282753, at *5 (B.A.P. 9th Cir. Mar. 19, 2019) ("Given this evidence, and the fact that [the attorney] is "charged with the knowledge of the natural consequences of his actions," *In re Ormsby,* 591 F.3d at 1206, only one conclusion is possible: that [the attorney] filed the cross-complaint with the intent to injure [the defendant] by forcing him to incur time and expense defending a meritless lawsuit.") As a lawyer, LAI is not only presumed to know the law (*Del Real, supra,* 95 Cal.App.4th at 766; *King, supra,* 12 Cal.App.2d at 509), but as a debtor, he is charged with knowing the natural consequences of his actions. *In re Ormsby,* 591 F.3d at 1206.

138.    This issue is also the same for purposes of willful and malicious in the line of post-, cases cited above in which bankruptcy courts have found lawsuits that gave rise to the debor's indebtedness seeking protection from bankruptcy as meritless suits to meet the requirement for willful and malicious under Section 523(a)(6), namely, that LAI didn't even bother to submit evidence to support his tort claims of abuse of process, malicious prosecution and conspiracy to commit same which, under the second prong of California's anti-SLAPP statute, was an issue actually litigated and necessarily decided by the Superior Court and the Court of Appeal. (Exhibits H and I hereto.) LAI is therefore collaterally estopped from contending the LAI Lawsuit had any merit.

**E.    LAI Engaged in Other Vexatious and Unreasonable Conduct During the Litigation of the Anti-SLAPP Motion While it was on Appeal**

139.    The meritless nature of LAI's two tort causes of action that were alleged to claim punitive damages against WANG, MOORE and MELEN were vapid, based on demonstrably false factual allegations, proved to be extremely vexatious when the matter was pending appeal and initiated in the form of the FAC unreasonably and for an improper purpose, namely, to punish WANG and present her in a false light while litigating a contested dissolution, interfere with the attorney-client relationship between MELEN and WANG in the family law proceeding and to interfere with the attorney-client relationship between MOORE and WANG while MOORE was defending WANG in the fee dispute that was LAI's Lawsuit.

140.    After receiving the tentative ruling granting the special motion to strike, in part, LAI, without solicitation from the Superior Court, gratuitously presented without medical evidence that he had to be hospitalized with anxiety over the tentative ruling granting of the special motions to strike in asserting that he suffered from suicidal ideation over his defeat in this case in a transparent, but ineffective, attempt to gain sympathy with the Judge Kirwin then assigned to this matter. It was a shameful tactic. (MOORE's Opp. Decl., p. 20, ¶¶58-59 – Exhibit G hereto and Exhibits P and 12 thereto.)

141.    After notice of appeal and cross-appeals and cross-notice of automatic stays were served and filed in the Santa Clara Superior Court, LAI pursued a prolonged effort post-notice of appeal to have the automatic stays "lifted" so he could have a "handwriting expert" appointed by the Superior Court to analyze handwriting of Chinese characters that no one disputed was WANG's. LAI brought to successive such motions, both denied, in a crazed effort to claim that the Superior Court had been misled by these Chinese characters similar to how he had alleged the arbitration panel which never convened had to have been misled in the MFA. (MOORE's Opp. Decl., pp. 1-21, ¶¶1-64 – Exhibit G hereto.)

142.    Like the never convened arbitration panel, LAI never bothered to have the Chinese characters translated for the Superior Court at any time during the adjudication of the special motion to strike and no evidence was presented that anyone other than LAI and WANG could read Chinese.

These motions were then used to supplement the record on appeal even though these motions were not before the Sixth Appellate District. It was simply more vexatious and unreasonable conduct for an improper purpose that WANG, MOORE and MELEN had to constantly battle in the Superior Court and the Court of Appeal.

**ANY ONE OF THESE ACTIONS, ALONE OR IN COMBINATION, SUPPORTS A FINDING OF WILLFUL AND MALICIOUS UNDER 11 U.S.C. § 523(a)(6)**

143.    LAI's emails to WANG when he was informing her he was abandoning her as her lawyer in the family law proceeding demonstrated ample personal ill will, invoking the "wrath of God," against WANG, promising to inform other lawyers of his dispute with her and providing the veiled threat that he would taint her "credibility" with the family law court which is precisely what he proceeded to do when he made his false allegations against WANG and her then-current attorneys in LAI's Lawsuit. Whether WANG had an "ulterior motive" of some collateral, illegal objective to get back at WANG (see *Golden v. Dungan,* 20 Cal.App.3d 295 (1971)) or simply evaluating his conduct in light of his role as a fiduciary to WANG and his spite against her lawyers, there is more than enough to conclude that LAI was willful and malicious to cause them harm. This can be "inferred from the wilful abuse of the process" LAI engaged in against his former client and her then current lawyers. See *Tranchina v. Arcinas* (1947) 78 Cal.App.2d 522, 526; 4 Witkin, Summary of Cal.Law (8th ed. 1973), § 264, p. 2538.) In *Comment, Abuse of Process and Attachment: Toward a Balance of Power,* 30 UCLA L.Rev., 1218, 1229, it is observed that "[O]nce the wrongful act has been established, courts often infer the requisite ulterior purpose."

**V.    PRAYER**

WHEREFORE, WANG, MOORE and MELEN  consent to entry of a final order or judgment by the Bankruptcy Court, reserving to all parties the right to appeal from such verdict because of errors in the trial, and respectfully requests that the Court enter judgment against LAI as follows:

1.    Declaring that LAI's indebtedness to them as of November 27, 2023, in the amount of $173,903.12 plus additional costs and attorneys' fees, in an amount to be determined, is a non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(6);

2.  Granting a non-dischargeable judgment in favor of WANG, MOORE and MELEN against LAI in an amount to be determined, including without limitation, pre-judgment and postjudgment interest as provided by law, reasonable attorneys' fees, costs and expenses as authorized by law;

3.  Ordering LAI for examination upon motion pursuant to Fed. R. Bankr. P. 2004 and 11 U.S.C. § 343; and

4.  Granting WANG, MOORE and MELEN any other and further relief to which they may be entitled.


Dated: December 5, 2023                    Law Offices of Frank S. Moore




                                           /s/
                                           _____
                                           Frank S. Moore
                                           Attorney for Plaintiffs and Creditors
                                           WANG, MOORE and MELEN

Case: 23-51382   Doc# 18   Filed: 12/06/23   Entered: 12/06/23 10:39:37   Page 44 of 44